**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br><br>RICHARD ORTIZ,<br><br>Defendant. | Crim. No. 06-858 (KSH)<br><br><br><u>**Supplemental Sentencing Opinion**</u> |

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br><br>EDUARDO GARCIA-PAGADOR,<br><br>Defendant. | Crim. No. 07-256 (KSH) |

<u>**Katharine S. Hayden, U.S.D.J.**</u>

This opinion supplements the record made in the two sentencing decisions, <u>United States v. Richard Ortiz</u>, No. 06-858 (D.N.J. filed Oct. 30, 2007) and <u>United States v. Eduardo Garcia-Pagador</u>, No. 07-256 (D.N.J. filed Nov. 14, 2007), that the Court has made since filing its opinion in <u>United States v. Franz Copeland Sutton</u>, No. 07-426, 2007 U.S. Dist. LEXIS 79518 (D.N.J. Oct. 26, 2007). The Court's purpose is to set forth the factual basis for the downward variances it granted in these cases based on conditions in the Passaic County Jail, and to expedite future sentencing hearings in which that issue is raised.

1

The Court sentenced Richard Ortiz on October 30, 2007, and Eduardo Garcia-Pagador on November 14, 2007. They were prosecuted separately for different crimes. Both men were housed at the Passaic County Jail as federal detainees and, after they each pleaded guilty pursuant to a plea agreement, they continued to live in Passaic County Jail while awaiting sentencing. Their respective sentencing dates occurred shortly after the Court sentenced Franz Copeland Sutton below the advisory sentencing guidelines range, based on its findings about the conditions at the Passaic County Jail. As a result of that, each defendant relied on the decision in Sutton in arguing for a sentence below the guidelines.

Reviewing the Sutton decision:  the Court sentenced Franz Copeland Sutton after a two-day hearing at which testimony was given by the Warden of Passaic County Jail, Charles Meyers; the City of Paterson Fire Inspector, Samuel Gaita; a ranking official in the New Jersey Department of Corrections, Joseph Hartmann; and defendant Sutton himself. Based on uncontested facts about serious overcrowding in Passaic County Jail, the Court granted Sutton a downward variance of 7 months.

Sentencing of Richard Ortiz

Just days after the Sutton decision, Richard Ortiz appeared for his sentencing after entering a guilty plea to unlawful possession of a firearm as a convicted felon. Ortiz fell into Criminal History Category IV. His plea agreement did not stipulate to the reasonableness of the advisory guidelines sentencing range of 78-87 months. It turned out that he had been living in the same unit as Sutton, 2G-4, for 8 months, and his attorney argued for a downward variance. The government argued that the Sutton findings were not applicable to Ortiz. So the Court called Ortiz to the witness stand and he gave direct testimony and was cross-examined by the Assistant United States Attorney.

Nothing Ortiz said in his spontaneous testimony contradicted what the Court had heard from the Sutton witnesses. This is not surprising, because the specific facts in Sutton about overcrowding and its effects on the 50-year-old Passaic County facility came from the Warden and DOC official Hartmann,

2

who have been involved in the state/county dialog about the Jail's predicament for decades.  During that time the Department of Corrections has regularly granted waivers to Passaic County permitting it to bypass compliance with space design ratios and other requirements in the New Jersey Administrative Code applicable to prison and jail facilities.  Through those waivers, Passaic County has pushed its design capacity of 896 men and women to an inmate population of up to 2000. Passaic County has regularly failed to back up its stated intentions of building a new facility or substantially renovating the existing structure.  Through an Intergovernmental Agreement the federal government pays Passaic County $87 per day per federal prisoner housed at the Passaic County Jail; assuming an average population of 350 to 400 federal prisoners, this amounts to between $12 and $14 million annually.

Ortiz' personal witness to the conditions added credibly to the information developed in <u>Sutton</u> about the substandard conditions in 2G-4.  He testified that dogs participated in every daily roll call.  He indicated that inmate fighting was a constant concern, and the phones and the television were the main controls to prevent it.  The television remained on all day, and the phone was in use all day, so that uninterrupted sleep was not possible.  He stated that an educational program run by volunteers had closed down 6 months earlier, and the only scheduled time an inmate left the room was for religious services or for medical reasons.  He testified he never ate the prison meals after he found a roach in his food during one of his first meals at the Jail.  Instead, Ortiz lived on food from the commissary, which he obtained by a barter system:  inmates bought food for him weekly at the commissary and he made paintings on handkerchiefs for them.  There were days he went hungry rather than eat the prison food. He testified that when a fight broke out because an inmate taking a shower splashed water on a letter another inmate was writing at the tables located a few feet away, the guards stopped the fight by shooting balls into the room and he was accidentally hit by one of the balls.  He testified that the water that comes out of the showers is rusty brown, so he uses baby oil on his body when he showers.  He said the toilets were very dirty and surmised that he was sick for two weeks as a result of the dirty toilets.

3

He testified that in the cold weather 2G-4 was uncomfortably cold, and in the summer it was extremely hot. The heat was so great that it was hard to breathe, and to deal with it he would wet a towel and lay it over his body. He said he attended NA meetings that were helpful to him, but the meetings were discontinued because of gangs fighting in the hallways outside the meeting room, which scared the lady who was conducting the meetings. He testified that the inoperable shower in 2G-4 was used instead for pull-ups, but that he did not use the area for exercise because this was where the gangs congregated. He testified that at times when the Jail ran out of bunk space, prisoners were put in 2G-4 who slept on the floor in plastic containers called "boats." He stated he did his laundry by hand because it came back black from the prison laundry and he testified that there is no storage space available for inmates, so they kept their possessions in plastic bags tucked underneath the bunks. He slept in a triple bunk on the top level.

On cross-examination, he stated that his experience at the Jail, particularly as a result of what he learned in NA meetings, "opened up what I had inside of me . . . . I knew I could do it. I know I could do it. I know." And then he added: "To be honest with you, Passaic County is like, is like hell, to be honest with you. Because you can get killed if you don't know what you're doing. Somebody could hurt you really bad. Really is. That's the God honest truth. Because you can bump somebody by mistake or just even touch someone and they will get on you with no hesitation. And if that person belongs to a gang member, that gang will all jump you with no hesitation." This Court can only speculate how stressful it can be to live in such an environment 24 hours per day, 7 days per week, month after month. And it is unthinkable that such unrelenting stress could be ignored when it comes time for the Court to sentence under Section 3553(a) and Third Circuit jurisprudence.

Over the government's objection, and relying on the factors in 18 U.S.C. § 3553(a),the Court granted Ortiz a downward variance, reducing the advisory guidelines sentence by 8 months after it applied the sentencing steps articulated in United States v. Gunter, 462 F.3d 237 (3d Cir. 2006). As it

had when it sentenced Sutton, the Court picked out two specific factors in Section 3553(a) that it believed supported a guidelines variance because of conditions in the Jail: the need to promote respect for the law, 18 U.S.C. § 3553(a)(2)(A), and the need to provide correctional treatment in the most effective manner, 18 U.S.C. § 3553(a)(2)(D).

Sentencing of Eduardo Garcia-Pagador

When Eduardo Garcia-Pagador came for sentencing two weeks after that, the Court had received written submissions from the government and the defense that addressed its authority to depart from the guidelines based on conditions at Passaic County Jail. In support of the application for a sentence below the advisory guidelines, defense counsel requested permission to question Garcia-Pagador.[1]

Garcia-Pagador had gone into United States Marshals Service custody from Department of Homeland Security custody when he was charged with illegal re-entry and as a consequence, he was moved from Hudson County Jail to Passaic County Jail in June 2006 and housed in 2G-1. When the Court showed him a diagram of the configuration of 2G-4 that Warden Meyers had provided during the Sutton hearing, Garcia-Pagador testified that 2G-1 is identically configured. This confirmed Warden Meyers' testimony, which is that the four units within the 2G quad are identical. Garcia-Pagador had prior training as a carpenter and work experience in construction and was comfortable with using the Warden's diagram as a visual aid for his testimony, and the diagram became, without objection, the basis for exhibits that are attached to this opinion.

Court Exhibit 2 represents the configuration of 26 double and triple bunk beds, three tables, four phones, three sinks, one urinal, three commodes, three showers, and two televisions in the 40 by 54 foot room Garcia-Pagador lived in, 2G-1, and reflects where his triple bunk bed was located in the

---

[1] Commendably, the government did not stand in the way of making a full factual record in the sentencings of Sutton, Ortiz, and Garcia-Pagador.

upper left corner (marked with an "X').[2]  Court Exhibit 1 represents his rendering of the configuration of

the unit where he was moved just a few weeks before his sentencing, which turned out to be 2G-4, the

same place where Sutton and Ortiz were housed.  The Jail made some changes in 2G-4, after the hearing

in Sutton, that Garcia-Pagador penciled in on Court Exhibit 1.  Tables were moved away from the

immediate toilet and shower areas and eight double bunks were removed so that the population went

from 64 to 48 inmates.  Garcia-Pagador's rendering in Court Exhibit 3 indicates the post-Sutton table

arrangement in 2G-4.  Court Exhibit 4 is his illustration of the construction of his triple bunk bed, in

which he slept on the middle bunk.

Summarizing Garcia-Pagador's testimony:  the residents in 2G-1 were half Hispanic and half

members of the Crips gang.  He said that inmates did not register complaints about conditions with the

guards out of fear of the gangs.  Asked to explain, he testified that when religious services were stopped

months before, presumably because of gang behavior and interaction, there was no sense in

complaining because there would be serious consequences like fights or beatings.  "We are afraid – you

never know how people are going to react."  He said that one shower in 2G-1 was perpetually broken

and was used for hanging hand-washed laundry.  He testified that dogs accompanied the guards at the

11pm roll call, and dogs went into the cells during surprise checks that were made every month or

month and a half.  He said there were no fire drills conducted during the time he was in the Jail.  He said

the mattresses in the triple and double bunk beds rested on metal strips that exerted uncomfortable

pressure on the body, so in order to create a more even surface, the inmates would affix flattened juice

and milk cartons between the metal strips, a practice that the guards forbade whenever they found out

about it.  He said that in the corner of 2G-1, near his bunk, water poured down from the ceiling in the

winter around the area where a ceiling fan is installed.  To keep the water off their beds, inmates

---

[2] Court Exhibit 2 also serves to illustrate the configuration of 2G-4 at the time Ortiz and Sutton were living there, and illuminates the testimony they gave about the crowded conditions and lack of unencumbered space.

stretched plastic from the garbage over the open areas around the fan. This damaged the fan so it did not work during the summer months and the inmates suffered from the heat. The only occasion for leaving 2G-1 was for medical reasons or religious services, and as indicated the latter were stopped, by his estimate, three months earlier. He said that the inmates purchased commissary food in abundance, even though it was very expensive, because they preferred it to jail food. The prisoners kept the foods they purchased in plastic bags on the floor because there is no storage space. He testified that on Tuesdays and Fridays the inmates were ordered to remove their jail uniforms, and their beds were stripped and all these items were taken to be washed in the jail laundry, but when the items were returned they were still black and dirty. As a result, the inmates requested big plastic garbage bags that they filled with water and soap and washed their laundry by hand. There are no extra prison uniforms so when a uniform was sent to the laundry, its owner remained in his underwear. There is a window near his bunk in 2G-1, through which cold air came in and sometimes water as well when it rained or snowed. There were always flies around and sometimes mice as well. He testified that no extermination services were provided in 2G-1. He said he was left alone by the gangs because he agreed to pick up trash and leftovers from meal trays, which he would provide if someone wanted an unused salad or milk. "I always served them humbly and I did not have a problem with them." He said that the phones were a source of conflict; they are located near the sinks and are positioned very close to one another "[s]o when you try to talk on the phone and you bump into the other person and you really have no privacy to talk and the problems arise from that as well. It is mainly because of the phone that they are always fighting." In describing the amount of available space in 2G-1, Garcia-Pagador said, "Well, as you can see there are a lot of beds and there are some small tables and people sit on the bed and they sit at the tables to play and there is actually no room to write or anything. And of course people get up and try to walk around then they may just go by another person or they may look at you and then a fight starts."

7

Garcia-Pagador said that there came a point when the inmates of 2G-1 were taken out and relocated to 2G-4, which had 16 bunks, so that the number of inmates was reduced to 48.[3] The tables were located away from the toilet and shower/sink area, and there was seating space for 48. <u>See</u> Ct. Ex. 1 and Ct. Ex. 3. Some of the bunks had a flat surface instead of metal strips beneath the mattress.

Garcia-Pagador was being sentenced after he pleaded guilty to illegal re-entry. He had been deported based on a conviction for smuggling illegal aliens into the United States. The advisory guidelines range was 41-51 months. Over the government's objection, the Court imposed a sentence of 29 months, granting a variance of 12 months below the bottom of the guidelines range. In so doing, the Court rejected the government's arguments derived from pre-*Booker* jurisprudence that Garcia-Pagador was not eligible for a downward departure (or adjustment) because he had suffered no special harm by reason of illness or specific mistreatment; his basic needs were being met; and he had not registered complaints about the harsh conditions while he was enduring them.

In granting the variance, the Court noted that all three defendants who had testified about the conditions in Passaic County Jail had, in effect, coped. The Court determined that this should not be held against them and that what Garcia-Pagador talked about – stretching plastic over the ceiling holes; using the broken shower to dry laundry; spreading flattened cartons across the spaces between the metal strips beneath the mattresses; using commissary food at significant expense to avoid bad food; learning to walk carefully between others to escape being in a fight because of bumping up against an angry inmate – was all about surviving under degrading circumstances. The Court concluded as it had in <u>Sutton</u> and <u>Ortiz</u> that the issue confronting it was whether a federal prisoner's experience in

---

[3] Garcia-Pagador testified this happened two months earlier, which would be some time in September, 2007. But from other testimony it appears that 2G-4 was not "de-populated" and reconfigured as he described until after Ortiz testified, which was on October 30, 2007.

substandard conditions that made his detention overly punitive has a bearing on the decision of a sentencing judge applying Section 3553(a)(2)(A) factors that call for fair punishment, respect for the law, and, in Section 3553(a)(2)(D), specify that a sentencing judge must provide correctional treatment in the most effective manner.

### Applying Information Developed in Sutton, Ortiz, and Garcia-Pagador

The Court has now had the benefit of three sentencing hearings about conditions in Passaic County Jail. The lead-off witnesses were not defendants who wanted a lower sentence, but fed-up county, state, and municipal employees who were putting forth the facts, facts which did not cover any of them in glory. The three men who lived in the Jail, Sutton, Ortiz, and Garcia-Pagador, did have a stake in the outcome, of course, but with the exception of Franz Copeland Sutton, they were not called to testify with the benefit of preparation by counsel. Indeed, no one knew Richard Ortiz would be testifying. There was amazing consistency, and moments of candor and revelation that were memorable and painful to those who heard how these men coped and endured. The Court has heard enough about the features of the 2G units to find, categorically and at a minimum, that up to the point where 2G-4 underwent some improvements, the overcrowding of federal inmates housed in Passaic County Jail resulted in unhygienic living conditions in a facility with terrible plumbing and ventilation that failed to comply with municipal fire code requirements despite the obvious risk to inmates. Unquestionably, every prisoner housed in these units was denied meaningful personal space.

This does not mean that conditions in Passaic County Jail are the only considerations to be weighed by a sentencing judge. Nor does the Court believe that a formulaic approach is appropriate. For example, the government has argued, with reason, that the criminal conduct being punished may pose a risk to society that cries out for incapacitation, which might serve as a powerful counterbalance to significant mitigation based on overly punitive confinement. The landscape is open for argument that the reasons a defendant remained in detention might come from self-interest, again a counterweight.

9

All this is fair argument, along with information that the government may present through its own investigations.  But having heard undisputed testimony from the defendants in these cases and the officials who testified in <u>Sutton,</u> the Court is unwilling to require a veteran of Passaic County Jail detention who is to be sentenced by this Court to present evidence of particularized harm before he or she may argue for a variance below the advisory guidelines.

This Court is persuaded that a fair record has been made about the conditions of confinement at the Passaic County Jail on the basis of the facts developed during the sentencings of Sutton, Ortiz, and Garcia-Pagador.  In the future, this Court will entertain an application by a defendant facing sentencing who was a pre-trial detainee at the Passaic County Jail, to incorporate the prior testimony about jail conditions into the record at his or her sentencing.  The Court anticipates that this will streamline the proceedings and avoid repetitive testimony.  A defendant will be free to supplement the record, if appropriate.  Of course, the government is free to introduce any evidence it chooses to dispute the facts established at the prior sentencings or to address any related issue it chooses at the sentencing in question.

It bears saying again that to do otherwise, for this Court, is impossible:  like it or not, the Court has received compelling information from serious professionals in the corrections community and from individuals who have suffered significantly after judicial officers remanded them to federal custody to await disposition of their cases.   Their information is in the Court's face, and a principled sentence under Section 3553(a), and Third Circuit law, <u>see</u> <u>United States v. Cooper,</u> 437 F.3d 324 (3d Cir. 2006) and <u>United States v. Gunter,</u> 462 F.3d 237 (3d Cir. 2006), requires that attention must be paid.

Dated: November 27, 2007                          /s/  Katharine S. Hayden

                                                                  Katharine S. Hayden, U.S.D.J.



C-2
11/14/07

S = sink
U = urinal

BEDS = 6' long
TABLE = 8' long



C-3
11/14/07



Placement
of Tables in
2G4
as of Nov 14 2007

C - 4
11/14/07

